**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OKLAHOMA**

SHELLEY SEALS,                        )
                                      )
                    Plaintiff,        )        Case No. 12-CV-569-JED-TLW
v.                                    )
                                      )
CHRIS JONES, DAVID POTTER, KACIE )
OBERG, JOHNNA WEAST, CLINT            )
SCOTT WALTON, BOARD OF COUNTY )
COMMISSIONERS FOR THE COUNTY )
OF ROGERS, JOSEPH LESTER, RONDA )
HALL, BOARD OF COUNTY                 )
COMMISSIONERS FOR THE COUNTY )
OF CLEVELAND,                         )
                                      )
                    Defendants.       )

## OPINION AND ORDER

### I.    The Defendants' Motions

Before the Court are two summary judgment motions.  One (Doc. 71) is filed by the

Board of County Commissioners for the County of Cleveland (Cleveland County Board),

Cleveland County Sheriff Joseph Lester, and Cleveland County Court Clerk Rhonda Hall.  When

referred to collectively, these defendants will be identified as "Cleveland County defendants."

The second (Doc. 74) is filed by the Board of County Commissioners for the County of Rogers

(Rogers County Board) and Rogers County Sheriff's Office (RCSO) employees Clint Walton

(Sheriff), Chris Jones, David Potter, Kacie Oberg, and Johnna Weast.  When referred to

collectively, these defendants will be identified as "Rogers County defendants."

For the reasons discussed below, the Court concludes that there is no genuine dispute of

material fact and the defendants are entitled to judgment as a matter of law on plaintiff's claims.

The Court also determines that the defendants sued in their individual capacities (Jones, Potter,

Oberg, and Weast) are entitled to qualified immunity under the uncontroverted facts presented.

## II.     Background

The following facts are undisputed.  On January 25, 2010, a Cleveland County bench warrant was issued for the plaintiff's arrest as a result of plaintiff's failure to appear at a hearing on assets in a small claims debt collection action.  The Cleveland County Court Clerk sent the original warrant to the Cleveland County Sheriff's Office (CCSO) and sent a certified copy of the warrant to the RCSO.  On December 27, 2010, an Order Recalling Bench Warrant, signed by a Cleveland County judge, was filed of record in the Cleveland County District Court.  A CCSO employee then marked the warrant as recalled in the system used by the CCSO, pulled the original warrant, dated and marked it "RECALLED," and returned the original warrant to the Cleveland County Clerk's Office.  The Order Recalling Bench Warrant and notations indicating the recall of the warrant were publicly available on the Oklahoma Supreme Court Network (OSCN) from and after December 28, 2010.

On March 11, 2012, Rogers County Deputy Chris Jones stopped plaintiff's car for a nonworking headlight.  Jones called Rogers County Dispatch and provided plaintiff's identifying information from her driver's license.  Rogers County Dispatchers Johnna Weast and Kacie Oberg were on duty at the time.  One of the dispatchers entered plaintiff's information into the RCSO computer system, which revealed the existence of a warrant for plaintiff's arrest but, for some unknown reason, did not flag that the warrant was "out of county," meaning not issued from Rogers County.  One of those dispatchers then called the Rogers County jail to confirm the existence of the warrant.  David Potter, a correctional officer at the jail, reviewed the active warrants file, which contained a copy of a Cleveland County warrant for plaintiff's arrest.  Potter did not notice that the warrant originated from Cleveland County and, believing that the warrants

file contained only active Rogers County warrants, Potter notified RCSO dispatch that the warrant was valid, and dispatch in turn notified Deputy Jones of the warrant.

Jones then returned to plaintiff's car and informed her that she was under arrest. He handcuffed her and placed her in his vehicle. Plaintiff's vehicle was towed from the scene. Jones took plaintiff to the Rogers County Jail, where jail staff began to process the plaintiff into the Jail. Her handcuffs were removed, and she was patted down over her clothes.

An out of county warrant should be verified with the originating county. For reasons that are not definitively explained in the record, the out of county notification flag in the RCSO computer system did not appear when the dispatcher initially checked on the warrant for plaintiff's arrest. As of the date of plaintiff's arrest, Cleveland County had not notified the RCSO that the bench warrant for plaintiff's arrest had been recalled.

The testimony of Potter differs from the testimony of Jones, Weast, and Oberg regarding who discovered that the warrant was a Cleveland County warrant that would need to be verified and when that discovery was first made. Potter testified that, a few minutes after he confirmed the warrant to dispatch, he noticed that the warrant was out of county and that he promptly notified dispatch that it would need to be verified. Jones testified that, after he arrived at the jail with plaintiff under arrest, Potter provided him a copy of the warrant, Jones then noticed it was an out of county warrant, and Jones then informed Weast of that fact. Consistent with the testimony of Jones, Weast and Oberg testified that it was Jones who notified Weast that the warrant was from Cleveland County and that was the first time any of the Rogers County Defendants became aware that the warrant originated from out of county.

After learning that the warrant was an out of county warrant, Rogers County dispatch then contacted Cleveland County dispatch, informed Cleveland County that RCSO "ha[d]

plaintiff in custody and ... want to know if you want to place a hold for her."  The CCSO deputy

responded that the warrant was no longer active and that "there would be no hold from Cleveland

County."  Jones thereafter informed plaintiff that it had been determined that the warrant was not

valid and that he had been unaware of that fact when he arrested her.  Plaintiff was released, and

Potter contacted the towing company to arrange the return of plaintiff's car to the Jail.  Plaintiff

was held not responsible for the towing fees.  Jones did not issue any citation for the headlight,

and no charges were filed against plaintiff.

In her Amended Complaint, plaintiff asserted claims under 42 U.S.C. § 1983 against all

defendants,[1] as well as state common law claims for infliction of emotional distress, assault and

battery, and false arrest.   She alleges that her rights under the Fourth and Fourteenth

Amendments to the United States Constitution were violated by the events leading to her

detention, search, and arrest.  Plaintiff alleges that the Cleveland County Defendants failed to

properly purge the arrest warrant and to notify the RCSO of the warrant's recall, and that all

defendants are liable for unlawful arrest.

The principal issues presented by the summary judgment motions are (1) whether the

individual defendants are entitled to qualified immunity, (2) whether plaintiff has presented

evidence sufficient to maintain her municipal liability claim against Rogers and Cleveland

Counties, and (3) whether there are genuine fact issues which must be presented to a jury on

plaintiff's state law claims.

---

[1]    Plaintiff's Amended Complaint does not list the Rogers County Board as the target of any
causes of action.  (*See* Doc. 47 at 12-16 [headings under each cause of action]).  However, in her
First Cause of Action, she generally references the Rogers County Board, names several Rogers
County Defendants in their official capacities, and references "official policy or the custom,
practice and usage of" the RCSO, which allegedly resulted in her arrest.  Because official
capacity suits are the same as naming a municipality or county, the Court construes that First
Cause of Action as intending to include the Rogers County Board.

**III.     Summary Judgment Standard**

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986).   "By its terms, [the Rule 56] standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact."   *Anderson*, 477 U.S. at 247-48 (emphasis in original).   "[S]ummary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248.   The courts thus determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251-52.   The non-movant's evidence is taken as true, and all justifiable and reasonable inferences are to be drawn in the non-movant's favor. *Id.* at 255.

The same standard applies at the summary judgment stage where qualified immunity is raised. *See Tolan v. Cotton*, ___ U.S. ___, 134 S. Ct. 1861, 1866-68 (2014) (per curiam).   Thus, the court may not weigh the evidence and must resolve genuine disputes of material fact in favor of the nonmoving party.   Thus, the district court may not credit the evidence of the party seeking summary judgment and ignore evidence offered by the non-movant, and must draw reasonable inferences in favor of the non-movant. *Id.* at 1868.

**IV.     Section 1983 Claims**

    **A.     Individual Capacity Claims Against Jones, Potter, Oberg, and Weast**

The plaintiff's § 1983 claims include an assertion that defendants Jones, Potter, Oberg and Weast "acting individually ... falsely and unlawfully arrested and detained" the plaintiff and therefore violated her rights under the Fourth Amendment.  (Doc. 47 at ¶ 76).[2]  These defendants assert that they are entitled to qualified immunity.  In resolving questions of § 1983 qualified immunity at the summary judgment stage, courts generally engage in a two-pronged inquiry. *Tolan*, 134 S. Ct. at 1865.  The first prong "asks whether the facts, '[t]aken in the light most favorable to the party asserting the injury, ... show the officer's conduct violated a [federal] right.'"  *Id.* (quoting *Saucier v. Katz*, 533 U.S. 194, 201 (2001)); *see also York v. City of Las Cruces*, 523 F.3d 1205, 1209 (10th Cir. 2008).  The second prong asks "whether the right in question was 'clearly established' at the time of the violation."  *Tolan*, 134 S. Ct. at 1866 (quoting *Hope v. Pelzer*, 536 U.S. 730, 739 (2002)).  Government actors are "shielded from liability ... if their actions did not violate 'clearly established statutory or constitutional rights of which a reasonable person would have known.'"  *Id.* (quoting *Hope*, 536 U.S. at 739).

"[W]hether an official protected by qualified immunity may be held personally liable for an allegedly unlawful official action generally turns on the 'objective legal reasonableness' of the action, assessed in light of the legal rules that were 'clearly established' at the time it was taken."  *Anderson v. Creighton*, 483 U.S. 635, 639 (1987) (citation omitted).  The courts have discretion to determine "which of the two prongs of the qualified immunity analysis should be

---

[2]    Consistent with the § 1983 claims asserted by plaintiff here, where the plaintiff claims to have been seized and arrested without legal process, her Fourth Amendment claim is analogous to false arrest or false imprisonment.  *See Mondragon v. Thompson*, 519 F.3d 1078, 1082-83 (10th Cir. 2008).

addressed first in light of the circumstances in the particular case at hand." *Pearson v. Callahan*, 555 U.S. 223, 236 (2009).

### 1. First Prong: Violation of a Constitutional Right

The parties dispute whether plaintiff's Fourth Amendment right to be free from unreasonable seizure was violated. The defendants argue that Deputy Jones had probable cause to arrest plaintiff based upon plaintiff's admission that she was driving with a nonworking headlight. The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. "In the context of a false arrest claim, an arrestee's constitutional rights were violated if the arresting officer acted in the absence of probable cause that the person had committed a crime." *Kaufman v. Higgs*, 697 F.3d 1297, 1300 (10th Cir. 2012). A warrantless arrest is reasonable under the Fourth Amendment where there is probable cause to believe that a criminal offense has been or is being committed. *Devenpeck v. Alford*, 543 U.S. 146, 152 (2004). Whether probable cause exists "depends upon the reasonable conclusion to be drawn from the facts known to the arresting officer at the time of the arrest." *Id.* "[T]he officer is entitled to qualified immunity if a reasonable officer could have believed that probable cause existed to make the arrest." *York*, 523 F.3d at 1210 (quoting *Robertson v. Las Animas County Sheriff's Dep't*, 500 F.3d 1185, 1191 (10th Cir. 2007)). "Qualified immunity also insulates the defendant who reasonably, albeit mistakenly, concludes that there is probable cause." *Id.*

"If an officer has probable cause to believe that an individual has committed *even a very minor criminal offense in his presence*, he may, without violating the Fourth Amendment, arrest the offender." *Atwater v. City of Lago Vista*, 532 U.S. 318, 354 (2001) (emphasis added) (probable cause existed to arrest for failure to wear seatbelts and arrest was therefore not a

violation of the Fourth Amendment). In making an arrest, the officer's "state of mind (except for the facts that he knows) is irrelevant to the existence of probable cause." *Devenpeck*, 543 U.S. at 152. "[H]is subjective reasoning for making the arrest need not be the criminal offense as to which the known facts provide probable cause." *Id.* at 153. "'[T]he fact that the officer does not have the state of mind which is hypothecated by the reasons which provide the legal justification for [his] action does not invalidate the action taken as long as the circumstances, viewed objectively, justify that action.'" *Id.* (quoting *Whren v. United States*, 517 U.S. 806, 813 (1996)). Therefore, the offense establishing probable cause does *not* have to be based on, or even closely related to, the same conduct as the offense identified by the officer as the basis for arrest. *Id.; see also Apodaca v. City of Albuquerque*, 443 F.3d 1286, 1289 (10th Cir. 2006) ("It is constitutionally irrelevant that [the officer's] reason for arresting [plaintiff] was his incorrect belief that she had violated a restraining order. All that matters is whether he possessed knowledge of evidence that would provide probable cause to arrest her on *some* ground."). An arrest is constitutional even if the arresting officer should have issued a citation rather than arresting the offender under state law. *Virginia v. Moore*, 553 U.S. 164, 176-78 (2008).

In *Brown v. Fisher*, 251 Fed. Appx. 527 (10th Cir. 2007) (unpublished), the Tenth Circuit concluded that a deputy sheriff was entitled to qualified immunity on the plaintiff's claim for unlawful arrest. In that case, the deputy stopped the plaintiff's vehicle for a nonworking headlight and arrested the plaintiff after plaintiff delayed producing his driver's license upon the deputy's demand. Relying upon the rules in *Atwater* (regarding very minor offenses providing probable cause to arrest) and *Apodaca* (officer's stated reason or belief about the arrest does not matter where there is probable cause to arrest on *some* ground), the Tenth Circuit concluded that the deputy was entitled to qualified immunity on a claim of unlawful arrest. *Brown*, 251 Fed.

Appx. at 534.  Specifically, the Court determined that, even though the deputy may not have had probable cause to arrest for the delay in producing the driver's license, the deputy was entitled to qualified immunity on the unlawful arrest claim because probable cause to arrest existed based upon the broken headlight:

> [Plaintiff] does not dispute that he was driving with an inoperable headlight at nighttime at the time he was pulled over.  This constitutes a violation of state law, and is a valid basis for his arrest.  Because [plaintiff] cannot establish that [the deputy] violated his constitutional rights in arresting him, [the deputy] is entitled to qualified immunity on [plaintiff's] claim for unlawful arrest.

*Id.* at 534-35 (citations omitted).  *Brown* is directly on point with respect to probable cause to arrest for an inoperable headlight, and is therefore highly persuasive.

For the foregoing reasons, the Court determines that the plaintiff's Fourth Amendment rights were not violated because Deputy Jones had probable cause to believe a crime had been committed in his presence.  Plaintiff admitted that she knew the headlight on her vehicle was out, and she does not now dispute that she was driving with the inoperable headlight in violation of *Okla. Stat.* tit. 47, § 12-203.  While that crime was a minor one, it could provide the basis for probable cause to arrest under the authorities cited above.  That Jones identified the warrant as the basis for the arrest is irrelevant under *Devenpeck* and *Apodaca*.  As there was probable cause to arrest plaintiff, the Court determines that the plaintiff's Fourth Amendment rights were not violated.

The warrant for plaintiff's arrest, although it had been recalled, provides an alternative basis for a determination of probable cause.  "When a probable cause determination was based on reasonable but mistaken assumptions, the person subjected to a search or seizure has not necessarily been the victim of a constitutional violation.  The very phrase 'probable cause' confirms that the Fourth Amendment does not demand all possible precision."  *Herring v. United*

*States*, 555 U.S. 135, 139 (2009).[3]  Numerous courts have concluded that arrests on recalled or invalid warrants did *not* violate constitutional rights where the arresting officer was unaware of the recall.  *See, e.g.*, *Mitchell v. Aluisi*, 872 F.2d 577, 579 (4th Cir. 1989) (arrest on recalled bench warrant did not violate plaintiff's constitutional rights where deputies were unaware of the order withdrawing the warrant); *Hanks v. County of Delaware*, 518 F. Supp. 2d 642, 649-50 (E.D. Penn. 2007) (arresting officer had probable cause to arrest on 20 year old bench warrant that was invalid but which the officer did not know was invalid at the time of arrest; also concluding that the officer's actions were objectively reasonable); *Davis v. Williams*, No. 90-4166-C, 1992 WL 50877, *6 (D. Kan. Feb. 27, 1992) (arrest of plaintiff on misdemeanor warrant that had been placed on hold did not violate her constitutional rights because the officers had no reason to know of the hold).

Another recent Tenth Circuit case, while not directly on point, is instructive on qualified immunity in the context of inaccurate information supplying the basis for probable cause to arrest.  In *Panagoulakos v. Yazzie*, 741 F.3d 1126 (10th Cir. 2013), the court reversed a district court's denial of qualified immunity in a § 1983 action.  There, an officer initiated a traffic stop of a driver whose truck had a faded, unreadable registration tag.  During the stop, the driver volunteered that he had a weapon in his vehicle, which prompted the officer to run a check through the National Crime Information Center (NCIC) database.  The NCIC report indicated, albeit inaccurately, that the driver was prohibited from possessing a firearm.  Upon being advised of the report, the driver indicated that he was subject to a protective order, but that the order allowed him to carry a firearm.  The officer called for a backing officer and then called "county

---

[3]      In *Herring*, the Supreme Court noted that an arrest on a recalled warrant did not necessarily violate a plaintiff's Fourth Amendment rights; however, because the parties in that case did not dispute that a violation occurred, the Court moved to a discussion of whether the arresting officers' conduct was objectively reasonable.

warrants," which advised that there was a valid protective order. Relying upon the NCIC report and the existence of the protective order and believing, incorrectly, that the driver was prohibited from possessing a firearm, the officers arrested the driver. In fact, the protective order did not prohibit the driver from possessing a firearm. Plaintiff was then held in jail for 11 days despite the fact that the backing officer, who examined the protective order after the driver's arrest, "believed, incorrectly, that all orders of protection prohibit possession of a firearm," and prepared a criminal complaint against the driver based upon that incorrect belief. *Id.* at 1128-30.

The district court in *Panagoulakos* held that the officers were entitled to qualified immunity as to the arrest because they had probable cause upon the NCIC report and the existence of the protective order. *See id.* at 1129. However, the district court denied qualified immunity to the backing officer on the continued detention, finding that the officer no longer had probable cause to detain the driver after she reviewed the protective order. In reversing the denial of qualified immunity on the continued detention, the Tenth Circuit held that, because the initial arrest was lawful and based upon probable cause, the backing officer would be entitled to qualified immunity because no clearly established law required the backing officer to release the driver after her review of the protective order. *Id.* at 1130-31. Like the arrest in *Panagoulakos*, the plaintiff's arrest here was lawful and based upon probable cause, notwithstanding that the basis for the probable cause (here, the existence of a warrant) turned out to be incorrect.[4]

---

[4]     Plaintiff cites *Courtney v. Oklahoma, ex rel. Dep't of Public Safety*, 722 F.3d 1216 (10th Cir. 2013) in support of her § 1983 claim. In *Courtney*, the officer issued a warning citation for the traffic violation, returned plaintiff's driver's license and paperwork "and wished him a safe trip," but then asked if he would be willing to answer additional questions. *Id.* at 1221-24 ("once an officer returns the driver's license and vehicle registration and issues a warning ticket, he must allow the driver to proceed ... unless the officer has an objectively reasonable and articulable suspicion that the driver is engaged in illegal activity"). The plaintiff here was *not* issued a warning ticket for the violation and then wished a safe trip, thus the "extended detention" involved in *Courtney* is not presented here.

Because there was probable cause to arrest, the individual defendants are entitled to qualified immunity on plaintiff's claims against them in their individual capacities under the first prong. Summary judgment is thus proper on those claims.

## 2. Second Prong: Cleary Established Law / Objective Reasonableness

Even assuming that there was not probable cause to arrest plaintiff, or if it were otherwise inappropriate to arrest her for the broken headlight, the Court determines that the defendants are still entitled to qualified immunity under the clearly established prong, as is discussed below.

In analyzing whether the federal right was clearly established at the time of the violation, "'the salient question ... is whether the state of the law' at the time of [the] incident provided 'fair warning' to the defendants 'that their alleged [conduct] was unconstitutional.'" *Tolan*, 134 S. Ct. at 1866 (quoting *Hope*, 536 U.S. at 741). In other words, the courts analyze whether the alleged right was sufficiently clear that a reasonable government employee "in the defendant's shoes" would understand that his or her actions violated that right. *See Casey v. West Las Vegas Indep. Sch. Dist.*, 473 F.3d 1323, 1327 (10th Cir. 2007). "The principles of qualified immunity shield an officer from personal liability when an officer reasonably believes that his or her conduct complies with the law." *Pearson*, 555 U.S. at 244. Thus, qualified immunity shields individuals who have "reasonable, but mistaken beliefs." *Saucier*, 533 U.S. at 206. "The protection of qualified immunity applies regardless of whether the government official's error is 'a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact.'" *Pearson*, 555 U.S. at 231 (quoting *Groh v. Ramirez*, 540 U.S. 551, 567 (2004)).

"As to whether the law was clearly established at the time of the alleged violation, [the Tenth Circuit] require[s] a section 1983 plaintiff to show that 'it would have been clear to a reasonable officer that probable cause was lacking under the circumstances. . .'" *Kaufman*, 697 F.3d at 1300 (quoting *Koch v. City of Del City*, 660 F.3d 1228, 1241 (10th Cir. 2011)). In

implementing this standard, a court asks "whether there was 'arguable probable cause' for an arrest – if there was, a defendant is entitled to qualified immunity."  *Id.* (quoting *Cortez v. McCauley*, 478 F.3d 1108, 1121 (10th Cir. 2007)); *Stonecipher v. Valles*, __ F.3d __, 2014 WL 2937038, *4 (10th Cir. Jul. 1, 2014).  "Arguable probable cause is another way of saying that the officers' conclusions rest on an objectively reasonable, even if mistaken, belief that probable cause exists."  *Stonecipher*, at *4.  "A defendant 'is entitled to qualified immunity if a reasonable officer could have believed that probable cause existed to arrest or detain the plaintiff.'"  *Id.* (quoting *Cortez*, 478 F.3d at 1120).

As an initial matter, plaintiff alleges only generally that the right to be free from "unreasonable searches and seizures," which are "associated with the Fourth Amendment to the United States Constitution[,] are clearly established," and she has not cited any Tenth Circuit or Supreme Court authority denying qualified immunity on any factual situation like the facts in this case.  (*See* Doc. 87 at 20).  The courts typically require a higher level of specificity of the legal rule than mere reference to the general text of the Constitution.  "The general proposition, for example, that an unreasonable search or seizure violates the Fourth Amendment is of little help in determining whether the volatile nature of particular conduct is clearly established."  *Ashcroft v al-Kidd*, __ U.S. __, 131 S. Ct. 2074, 2084 (2011); *see also Creighton*, 483 U.S. at 639 ("if the test of 'clearly established law' were to be applied at this level of generality, it would bear no relationship to the 'objective legal reasonableness' that is the touchstone of *Harlow [v. Fitzgerald*, 457 U.S. 800 (1982)].  Plaintiffs would be able to convert the rule of qualified immunity that our cases plainly establish into a rule of virtually unqualified liability simply by alleging violation of extremely abstract rights.").

The level of generality of the "clearly established" legal rule that is alleged to have been violated is important because "[t]he concern of the immunity inquiry is to acknowledge that reasonable mistakes can be made as to the legal constraints on particular police conduct." *See Saucier*, 533 U.S. at 205. "Officers can have reasonable, but mistaken, beliefs as to the facts establishing the existence of probable cause or exigent circumstances, for example, and in those situations courts will not hold that they have violated the Constitution. Yet, even if a court were to hold that the officer violated the Fourth Amendment by conducting an unreasonable, warrantless search, [Supreme Court precedent] operates to grant officers immunity for reasonable mistakes as to the legality of their actions." *Id.* at 206; *see also al-Kidd,* 131 S. Ct. at 2085 (Qualified immunity "gives government officials breathing room to make reasonable but mistaken judgments").

The same "objective reasonableness" standard that is applied in the context of the exclusionary rule to remedy a Fourth Amendment violation also "'defines the qualified immunity accorded an officer' who obtained or relied on an allegedly invalid warrant." *Messerschmidt v. Millender*, __ U.S. __, 132 S. Ct. 1235, 1245, n.1 (2012) (citing *Malley v. Briggs*, 475 U.S. 335, 344 (1986) and *Groh*, 540 U.S. at 551, 565, n.8). Accordingly, cases involving similar actions, although decided in the exclusionary rule context, may be of assistance in determining the objective reasonableness of an officer's actions for purposes of the § 1983 qualified immunity analysis. *See, e.g., Messerschmidt*, 132 S. Ct. at 1245; *Groh*, 540 U.S. 551, n.8 (2004).

The Supreme Court has dealt with arrests on recalled warrants in the exclusionary rule context. For example, in *Herring*, 555 U.S. at 137-39, the defendant was arrested on a warrant that had been recalled five months earlier. During a search incident to the arrest, drugs were found in his pocket, and he was charged in federal court for drug and gun violations. He moved

to suppress the evidence on the ground that his arrest was illegal because the warrant had been recalled before he was arrested. The underlying facts relating to the recalled warrant bear some similarities to the undisputed evidence in this case. Before the arrest in *Herring*, an investigator asked the Coffee County warrant clerk to check for any outstanding warrants for the defendant's arrest. She found none, and the investigator asked her to check with the warrant clerk in neighboring Dale County. The Dale County clerk checked the computer database and replied that there was an active arrest warrant for the defendant's failure to appear on a felony charge. That information was relayed to the investigator who, with a county sheriff's deputy, then pulled the defendant over and arrested him on the warrant. *Id.* at 137. However, there had "been a mistake about the warrant," and the Supreme Court summarized the facts relating to the mistake as follows.

> The Dale County sheriff's computer records are supposed to correspond to actual arrest warrants, which the office also maintains. But when [the Dale County clerk] went to the files to retrieve the actual warrant ... [she] was unable to find it. She called a court clerk and learned that the warrant had been recalled five months earlier. Normally when a warrant is recalled the court clerk's office or a judge's chambers calls [her and she] enters the information in the sheriff's computer database and disposes of the physical copy. For whatever reason, the information about the recall of the warrant for Herring did not appear in the database. [The Dale County warrant clerk] immediately called [her counterpart in Coffee County] to alert her to the mixup, and [the Coffee County warrant clerk] notified [the investigator] over a secure radio. This all unfolded in 10 to 15 minutes, but Herring had already been arrested and found with the gun and drugs.

*Id.* at 138.

Determining that the exclusionary rule did not apply to the facts, the Supreme Court in *Herring* applied the objective reasonableness standard set forth in *United States v. Leon*, 468 U.S. 897 (1984). *See* 555 U.S. at 138-147. The Court characterized its holding in *Leon* as follows: "When police act under a warrant that is invalid for lack of probable cause, the exclusionary rule does not apply if the police acted 'in objectively reasonable reliance' on the

subsequently invalidated search warrant." *Id.* at 142. The Court concluded that the officials in *Herring* acted in objectively reasonable reliance on the recalled warrant. *See id.* at 142-47. The Court also noted that the officials' mistakes in *Herring* were "the result of negligence ... rather than systemic error or reckless disregard of constitutional requirements." *Id.* at 147.

Another Supreme Court case decided in the exclusionary rule context also involved certain facts similar to those presented here. In that case, a Phoenix police officer initiated a traffic stop of Isaac Evans after observing Evans driving the wrong way on a one-way street. *Arizona v. Evans*, 514 U.S. 1, 4 (1995). After Evans informed the officer that Evans's license was expired, the officer ran a check on a computer data terminal in his patrol car. The computer inquiry indicated that there was an outstanding misdemeanor warrant for Evans's arrest, so the officer arrested him. *Id.* Following a search incident to arrest, officers discovered marijuana, and Evans was charged with possession. *Id.* After the officers arrested Evans, government employees discovered that the warrant had been quashed 17 days before his arrest, but the court clerk had not notified the sheriff's office that the warrant had been quashed, and the warrant had thus not been removed from the sheriff's office computer records. Arguing that his arrest was unlawful because of the quashed warrant, Evans moved to suppress the fruits of the search incident to that arrest. *Id.* Because there was "no indication that the arresting officer was not acting objectively reasonably when he relied upon the police computer record" which inaccurately stated that there was an outstanding misdemeanor warrant for Evans's arrest, the exclusionary rule did not apply. *Id.* at 1194.

The determination of whether an officer's actions were objectively reasonable "will often require examination of the information possessed" by the officers. *Creighton*, 483 U.S. at 641. That consideration does not transform the objective standard to be applied into a determination

of the officer's subjective motives. *Id.*; *see also Herring*, 129 S. Ct. at 703. The relevant inquiry "is the objective (albeit fact-specific) question ... whether a reasonable officer could have believed [the officer's action] to be lawful, in light of clearly established law and the information the ... officers possessed." *Creighton*, 483 U.S. at 641; *see Herring*, 129 S. Ct. at 703 (defining the objective question as "whether a reasonably well trained officer would have known that the search was illegal" in light of "all the circumstances," and recognizing that such "circumstances frequently include a particular officer's knowledge and experience").

Considering the circumstances and information possessed by Deputy Jones at the time of plaintiff's arrest, and in light of the Supreme Court's decisions in *Herring* and *Evans*, it is clear that Jones's reliance on the warrant was objectively reasonable. The undisputed evidence establishes that Deputy Jones relied upon the information relayed to him, which indicated that there was an outstanding bench warrant for plaintiff's arrest. While that information was inaccurate because the warrant had actually been recalled, there is *no evidence* that Jones was aware or had reason to know the information was inaccurate, and his arrest of plaintiff on the warrant was objectively reasonable under the circumstances. In other words, a well-trained officer with the information then possessed by Jones could have believed that the arrest was lawful. *See Creighton*, 483 U.S. at 641.

Plaintiff attempts to create an issue of fact based upon inferences from testimony that is far from clear. She asserts that, before plaintiff was arrested and taken to jail, Jones and the dispatchers must have known that the warrant had been recalled. That argument is loosely based on the testimony of Potter. He testified that, "probably a couple of minutes" after he informed dispatch that the warrant was valid, he discovered that the warrant was out of county. He further testified that he promptly notified dispatch that the warrant would need to be verified, and that

approximately five minutes later, he heard back from dispatch that the warrant was "inactive" or "voided." (*See* Doc. 87 at 8-9, 18-19; Doc. 74-11 at 15-16).[5] Comparing the rough timeline provided by Potter to Jones's testimony that he had arrested, cuffed, and placed plaintiff in his patrol car within "approximately five to 10 minutes" of receiving confirmation of the warrant and that it was "probably approximately 10 to 15 minutes" more until he drove toward the jail (*see* Doc. 87-4 at 4-6), plaintiff asserts that "Potter's testimony brings into question Defendants' assertion that Defendant Jones was unaware that the Cleveland Count [sic] warrant was invalid until he returned to the jail." (Doc. 87 at 8-9). That assertion is not supported by any *evidence* that Jones (or the dispatchers) knew the warrant had been recalled prior to plaintiff's arrest; rather, it is premised upon drawing inference upon inference from an approximated and less than clear timeline covering a matter of only minutes. (*See id.*). The Court has reviewed all of the testimony cited by plaintiff, and that testimony does *not* support any inference that Jones knew of the warrant recall before he arrested the plaintiff.

In fact, contrary to plaintiff's assertion that Potter's testimony "brings into question" whether Jones knew of the warrant recall before arriving at the jail, Potter directly testified that Jones did *not* learn of the recall of the warrant until Jones arrived at the jail with plaintiff already in custody. (Doc. 74-11 at 15 [p. 57 – Jones first saw the warrant when he arrived at the jail] and 16-17 [pp. 61-62 – Jones was "shocked" to learn that the warrant was an out of county warrant]). Moreover, the plaintiff did not dispute that "[o]nce at the jail ... Potter informed Deputy Jones that he had realized the warrant was out of Cleveland County after looking at it again. Cleveland

---

[5]     While plaintiff centers her summary judgment argument upon Potter's testimony, she did not include that testimony with her summary judgment response. However, the Court located the testimony referenced by plaintiff, as it was attached as Exhibit 11 to the defendants' motion. Thus, all references herein to Potter's testimony are to the defendants' exhibit rather than the exhibit number provided by plaintiff in her brief.

County dispatch was *then contacted* by someone with Rogers County." (Doc. 72 at 17, ¶ 27; Doc. 86 at 5 [plaintiff does not dispute ¶ 27 of Doc. 72]) (emphasis added). The Court has also listened to the audio recording of the call from RSCO dispatch to the CCSO. Consistent with plaintiff's admission that the CCSO was contacted after Jones arrived at the jail with plaintiff, in the phone call, "Johnna" informed the CCSO that Rogers County had "just brought [plaintiff] in" and "we have her in custody." (Doc. 72, attachment 20 [conventionally filed CD]). The undisputed evidence in this case establishes that Jones's arrest of plaintiff was objectively reasonable based upon the information he possessed at the time of the arrest. *See Evans*, 514 U.S. at 1194; *Herring*, 129 S. Ct. at 699-704.

Plaintiff attempts to draw inferences from the same blurry timeline to support her assertion that Johnna Weast knew that the warrant had been recalled prior to Jones's arrest of plaintiff but, as noted, the inferences which plaintiff suggests are not supported by the record, including the audio recording of the call between Weast and the CCSO and plaintiff's own admissions, and are accordingly not reasonable or justified inferences. There is scant evidence in the record of any relevant action by Oberg which would even remotely subject her to liability. Defendant Oberg is simply lumped together with Weast in plaintiff's description of the facts, but both Jones and Weast testified that Weast – not Oberg – was the dispatcher who communicated with Jones regarding the warrant prior to plaintiff's arrest, and plaintiff has presented no evidence to the contrary. Rather, plaintiff simply asserts that Oberg, Weast, and Potter are liable because each "participated in a botched attempt to verify an out-of-county civil bench warrant...." (Doc. 87 at 18). But the evidence construed in plaintiff's favor reveals nothing more than mistakes as to whether there existed an outstanding warrant, based upon the RCSO's computer mistakenly failing to identify the warrant as out of county and Potter's mistake in

initially believing the warrant was a valid Rogers County warrant, such that the Rogers County employees did not verify the warrant with Cleveland County before plaintiff was arrested.

Jones, Weast, Oberg, and Potter reasonably, but mistakenly, believed there was an outstanding warrant, and Jones arrested plaintiff based upon that information. The undisputed evidence is that plaintiff was arrested within five to ten minutes of Jones being notified that a valid warrant existed for plaintiff's arrest, and plaintiff has not presented any evidence that substantiates her argument that Weast, Oberg, and Potter learned before the arrest that the warrant had actually been recalled or that they had conveyed such information to Jones prior to plaintiff's arrest or transport to the jail. These individuals are entitled to summary judgment based upon qualified immunity.

### B. Municipal Liability Claims

#### 1. There is No Municipal Liability Where There was No Underlying Constitutional Violation by any County Official

Because the plaintiff's Fourth Amendment rights were not violated (*see* above discussion under "First Prong"), the plaintiff's municipal liability claims also fail as a matter of law, because there was no underlying constitutional violation by any of the officers of Rogers County or Cleveland County. *See, e.g., Hinton v. City of Elwood, Kan.*, 997 F.2d 774, 782 (10th Cir. 1993); *Martinez v. Beggs*, 563 F.3d 1082, 1091 (10th Cir. 2009) (citing *Olsen v. Layton Hills Mall,* 312 F.3d 1304, 1317–18 (10th Cir.2002)).

Even assuming that plaintiff's Fourth Amendment rights were violated by the arrest, plaintiff has not provided evidence creating any genuine dispute of material fact in support of her municipal liability claims, as is discussed below.

### 2. General Standards Applicable to Municipal Liability Under § 1983

Plaintiff has asserted claims under § 1983 against several Rogers County defendants (Jones, Potter, Oberg, Weast, and Walton) and Cleveland County defendants (Lester and Hall) in their official capacities, and has also sued the Rogers County Board and the Cleveland County Board. The official capacity claims are considered to be claims for municipal liability and are thus one and the same as suing the counties, and the Court therefore applies municipal liability law to all § 1983 claims asserted against the county bodies and their employees sued in their official capacities. *See, e.g., Kentucky v. Graham*, 473 U.S. 159, 165-66 (1985) (an official capacity "suit is, in all respects other than name, to be treated as a suit against the entity"); *Myers v. Okla. County Bd. of County Comm'rs*, 151 F.3d 1313, 1316 n.2 (10th Cir. 1998) (an official capacity claim is the same as a suit against the municipal entity; court therefore referred to suit against county and official capacity suit against sheriff as suit against the county). "There is no longer a need to bring official-capacity actions against local government officials [because] local government units can be sued directly." *Graham*, 473 U.S. at 167, n.14. [6]

---

[6] The Rogers County Board asserts that it is not a proper party. Counties are local government units and may generally be sued under § 1983 for the official acts of county officials (such as the Sheriff) with policymaking authority. *See Graham*, 473 U.S. at 167, n.14. Under Oklahoma law, "[e]ach organized county within the state shall be a body corporate and politic and as such shall be empowered ... [t]o sue and be sued...." *Okla. Stat.* tit. 19, § 1. "The powers of a county as a body politic and corporate shall be exercised by its board of county commissioners." *Id.*, § 3. "In all suits or proceedings by or against a county, the name in which a county shall sue or be sued shall be, "Board of County Commissioners of the County of _____." *Id.* § 4. It is undisputed that the Rogers County Sheriff, sued in his official capacity, is a proper defendant in this case, which is the same as suing Rogers County under § 1983. *Lopez v. LeMaster*, 172 F.3d 756, 762 (10th Cir. 1999) ("[Plaintiff]'s suit against Sheriff LeMaster in his official capacity as sheriff is the equivalent of a suit against Jackson County, [Oklahoma]."). Thus, whether the Sheriff in his official capacity or the County (sued in the name of the Board) is the proper defendant for municipal liability purposes does not matter to this analysis, as both are considered claims against the County and are analyzed under the same standards. In any event, because the Court determines that summary judgment is required on plaintiff's municipal claims as to Rogers County, it is unnecessary to determine whether the Board was a proper defendant.

A municipality or county may not be held liable under § 1983 solely because its employee inflicted injury; municipal liability cannot be found by application of the theory of *respondeat superior*. *Monell v. Dept. of Soc. Servs. of City of New York*, 436 U.S. 658, 694 (1978). "[L]ocal governments are responsible only for 'their *own* illegal acts.'" *Connick v. Thompson*, __ U.S. __, 131 S. Ct. 1350, 1359 (2011) (quoting *Pembaur v. City of Cincinnati*, 475 U.S. 469, 479 (1986)). "[I]t is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983." *Monell*, 436 U.S. at 694. Thus, to establish municipal liability under § 1983, a plaintiff must show "1) the existence of a municipal policy or custom and 2) a direct causal link between the policy or custom and the injury alleged." *Graves v. Thomas*, 450 F.3d 1215, 1218 (10th Cir. 2006) (citing *City of Canton, Ohio v. Harris*, 489 U.S. 378, 385 (1989)). The requirement of a policy or custom distinguishes the "acts of the *municipality* from acts of *employees* of the municipality, and thereby make[s] clear that municipal liability is limited to action for which the municipality is actually responsible." *Pembaur*, 475 U.S. at 479 (emphasis in original).

The Tenth Circuit has described several types of actions that may constitute a municipal policy or custom.

> A municipal policy or custom may take the form of (1) "a formal regulation or policy statement"; (2) an informal custom "amoun[ting] to 'a widespread practice that, although not authorized by written law or express municipal policy, is so permanent and well settled as to constitute a custom or usage with the force of law'"; (3) "the decisions of employees with final policymaking authority"; (4) "the ratification by such final policymakers of the decisions – and the basis for them – of subordinates to whom authority was delegated subject to these policymakers' review and approval"; or (5) the "failure to adequately train or supervise employees, so long as that failure results from 'deliberate indifference' to the injuries that may be caused."

*Bryson v. City of Okla. City*, 627 F.3d 784, 788 (10th Cir. 2010) (citations omitted).

### 3. Section 1983 Municipality Claims Against Rogers County

*Policy or Custom*

Plaintiff argues that "well-established, pervasive customs," rather than official policies, of the RCSO caused a violation of plaintiff's Fourth Amendment right to be free from unreasonable seizure. (Doc. 87 at 15). She identifies the relevant "custom" as follows: RCSO "adopted a custom and practice of not periodically examining the active warrant file for accuracy and not purging outdated and cancelled warrants from the active warrant file." (*Id.* at 17). Plaintiff acknowledges that the RCSO has a formal policy that provides that "warrants will be ... periodically examined for accuracy and to purge outdated or cancelled warrants," but asserts that the actual practice did not follow that policy because RCSO Undersheriff Sappington admitted that "it's possible ... that [the filing cabinets with warrants contain] invalid warrants that have not been purged." (*See id.* at 15-16; *see also* Doc. 87-6 at 10-11). In addition, plaintiff relies upon the Undersheriff's testimony that, aside from a "corrections officer ... physically verifying the warrant and the agency it's derived from, and by [the RCSO warrant officer] monitoring the recall and the newly served warrants," the RCSO does not have a routine of examining the warrants in the active warrants file. (Doc. 87 at 15-16; *see also* Doc. 87-6 at 9).

Where the alleged basis for municipal liability is not a formal policy, but a "custom or usage," the plaintiff must provide evidence of a practice that is "so widespread as to have the force of law." *Board of County Comm'rs of Bryan County v. Brown*, 520 U.S. 397, 403-04 (1997). "In order to establish a custom, the actions must be 'persistent and widespread practices of [municipal] officials.'" *Lankford v. City of Hobart*, 73 F.3d 283, 286 (10th Cir. 1996) (quoting *Starrett v. Wadley*, 876 F.2d 808, 818 (10th Cir. 1989) and *Monell*, 436 U.S. at 691).

The failure to periodically examine warrants does not amount to a widespread practice or custom supporting municipal liability under § 1983. In a case involving the arrest of a woman on a warrant that had been recalled prior to her arrest, the Fourth Circuit found allegations of inadequate procedures to prevent the service of recalled warrants was insufficient to maintain a municipal liability claim. The court noted that there was "no evidence of any [county] policy to serve invalid warrants" and no evidence of any widespread practice that would constitute a custom of serving invalid warrants because "plaintiff has not produced evidence of any other example of service of a recalled bench warrant by the respective defendants." *Mitchell*, 872 F.2d at 579-80. In affirming summary judgment disposing of § 1983 claims against the county sheriff and court clerks on a claim of unlawful arrest, the court further observed as follows.

> [W]e cannot deduce a municipal policy from bare allegations that state procedures were inadequate to prevent the service of recalled warrants. Plaintiff has suggested various improvements to the County's process for recalling warrants: written lists of all recalled warrants which are phoned into the Sheriff's Department; use of court computers to check the validity of old bench warrants before they are served; cross-checks of outstanding warrants against the district court daily docket sheets. *The absence of such procedures hardly denotes an unconstitutional county policy, however*.
>
> The Supreme Court has noted that nearly every § 1983 plaintiff will be able to point to something a municipality could have done to prevent an unfortunate incident. Permitting cases to go forward on such a basis "would result in *de facto respondeat superior* liability." *City of Canton*, [109 S. Ct. at 1206]. There is also a difference between a clerical error and the existence of an impermissible municipal policy. Even the most adequately trained officers occasionally make mistakes and the fact that they do so "says little about the ... legal basis for holding the city liable." *Canton*, ... 109 S. Ct. at 1206.

*Id.* at 580 (emphasis added).

The Court finds the reasoning of *Mitchell* persuasive here. As in *Mitchell*, the plaintiff in this case has not identified any systemic or widespread practice of serving invalid or recalled warrants. Rather, she merely points to an admission by the RCSO Undersheriff that "it is

possible" there exist invalid warrants in the warrants file. Yet she has not presented evidence to dispute the Undersheriff's testimony that deputies are to verify the warrants physically and the RCSO warrants officer monitors newly served warrants and a recall list. Moreover, plaintiff herself alleges, and the evidence is undisputed that, Potter understood that out of county warrants would need to be verified with the issuing agency, but he mistakenly believed that the warrant for plaintiff's arrest originated from Rogers County when he initially "verified" the warrant to the dispatchers. This further undermines plaintiff's contention that the RCSO's failure to routinely cross-check and purge warrants in its file was a direct cause or the moving force behind the plaintiff's arrest on the recalled warrant because, had Potter initially noticed that it was an out of county warrant, the RCSO would have contacted the CCSO to verify the warrant. In fact, once Potter or Jones realized the warrant was out of county, that is exactly what was done, and CCSO immediately announced that the warrant had been recalled, and plaintiff was promptly released from custody.

*Failure to Train*

Nor does the plaintiff's failure to train claim survive summary judgment. Plaintiff faults the training that Potter received because he did not receive "any classroom training on verifying warrants" and his only warrants training "was on-the-job training." (Doc. 87 at 16). She cites no authority for her proposition that training must be received in a classroom to be sufficient. Plaintiff also cites Potter's testimony that he was told that the warrants filing cabinets contained only Rogers County warrants. (Doc. 87 at 16-17). However, it is undisputed that Potter dealt with out of county warrants in the course of his job, and he knew that they must be verified. (*See* Doc. 74-11 at 9 [p. 33]).

Even assuming that Potter's training was inadequate, the evidence does not establish that such failure was deliberately indifferent. With respect to failure to train claims, the Supreme Court has recognized "limited circumstances in which an allegation of a 'failure to train' can be the basis for [§ 1983 municipal] liability." *Canton*, 489 U.S. at 387. Inadequate training of officers "may serve as the basis for § 1983 liability only where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact." *Id.* at 388. The Supreme Court has recently reiterated that "[a] municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train." *Connick*, 131 S. Ct. at 1359.

A municipality may be liable where "the need for more or different training is so obvious, and the inadequacy [in training] so likely to result in the violation of constitutional rights, that the policymakers of the [municipality] can reasonably be said to have been deliberately indifferent to the need." *Canton*, 489 U.S. at 390. "The touchstones of this inquiry, therefore, are the risk inadequate training poses and the [municipality's] awareness of that risk." *Brown v. Gray*, 227 F.3d 1278, 1288-89 (10th Cir. 2000). In *Connick*, the Supreme Court further elaborated on the deliberate indifference required to impose municipal liability under § 1983 for a failure to train:

> "'[D]eliberate indifference' is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action." Thus, when city policymakers are on actual or constructive notice that a particular omission in their training program causes city employees to violate citizens' constitutional rights, the city may be deemed deliberately indifferent if the policymakers choose to retain that program. The city's "policy of inaction" in light of notice that its program will cause constitutional violations "is the functional equivalent of a decision by the city itself to violate the Constitution." A less stringent standard of fault for a failure-to-train claim "would result in de facto respondeat superior liability on municipalities...."

> A pattern of similar constitutional violations by untrained employees is "ordinarily necessary" to demonstrate deliberate indifference for purposes of failure to train. Policymakers' "continued adherence to an approach that they know or should know has failed to prevent tortious conduct by employees may establish the conscious disregard for the consequences of their action – the 'deliberate indifference'- necessary to trigger municipal liability." Without notice in a particular respect, decision-makers can hardly be said to have deliberately chosen a training program that will cause violations of constitutional rights.

131 S. Ct. at 1359-60 (internal citations and quotations omitted). The Supreme Court also noted that it had not foreclosed "the possibility that the unconstitutional consequences of failing to train could be so patently obvious that a [municipality] could be liable under § 1983 without proof of a pre-existing pattern of violations," but reiterated that such liability is only available in a "rare" case involving a "narrow range of circumstances." *Id.* at 1361 (quoting *Bryan County*, 520 U.S. at 409); *see also id.* at 1366 (Scalia, J., concurring) (characterizing such claims as "rare").

There is no evidence in this case that any Rogers County policymaker was on notice of any deficient training which caused violations of citizens constitutional rights, there is no evidence of any pattern of similar (alleged) constitutional violations by untrained employees, and there is no evidence whatsoever that any policymaker deliberately chose a training program that would cause violations of constitutional rights. The undisputed evidence also undermines plaintiff's contention that this is one of those rare cases where a pattern of violations is unnecessary because the "unconstitutional consequences of failing to train [are] so patently obvious" that decision makers could be said to have deliberately disregarded the plaintiff's rights. *See Connick*, 131 S. Ct. at 1359-61. Here, any consequences of the alleged failure to train Potter were *not* "patently obvious," because it is undisputed that Potter *did know* that out of county warrants must be verified with the issuing entity and, once he or Jones examined the warrant and noticed it was issued from Cleveland County, the fact that the warrant had been recalled was immediately discovered from a very short phone call to CCSO.

The Court is unwilling to deduce the existence of a county policy that was the moving force behind any violation of plaintiff's constitutional rights merely based upon Potter's mistake upon initially reviewing the copy of the warrant. It is unfortunate that plaintiff was arrested on a warrant that had been recalled, but the reason the warrant was not initially verified with Cleveland County was merely the result of a mistake, not any custom or deliberately indifferent training. The Rogers County defendants' motion for summary judgment is granted on the plaintiff's municipal liability and official capacity claims.

### 4. Claims Against Cleveland County Defendants

In her Second and Third Causes of Action, plaintiff asserts that Sheriff Lester, Clerk of Court Hall, and the Cleveland County Board violated plaintiff's constitutional rights. Lester and Hall are sued only in their official capacities. (Doc. 47, ¶¶ 20, 26). Plaintiff alleges that those defendants, acting pursuant to Cleveland County policy, custom, or practice, violated plaintiff's rights by "fail[ing] to properly purge [the] recalled warrant" and "fail[ing] to provide notification to the [RCSO] that the warrant for the arrest warrant [sic] for Plaintiff had been recalled." (Id. at ¶¶ 79-80, 83-84). The particular "policy" of which plaintiff complains at the summary judgment stage is a "policy of not providing any notification to other counties when a civil bench warrant, issued out of Cleveland County and sent by certified mail to another county, had been recalled." (Doc. 86 at 11).

Plaintiff argues that such a policy "made it highly predictable and a plainly obvious consequence that individuals like [plaintiff] would be arrested in another county on a recalled civil bench warrant issued out of Cleveland County." (Id.). The undisputed facts in this case establish otherwise. Specifically, it is undisputed that (1) the warrant was recalled in the court computer docketing system (OSCN) and the system used by the CCSO (Doc. 72 at ¶ 16; Doc. 86

at 5 [plaintiff does not dispute ¶ 16]), (2) recall sheets were utilized and the original warrant was pulled and marked "RECALLED," (*id.*; Doc. 72-7 at 77); (3) the Order Recalling Bench Warrant was entered on the OSCN docket sheet on December 28, 2010; and (4) the OSCN docket sheet reflects that the original warrant was returned from the CCSO to the Court Clerk on December 30, 2010 (Doc. 72 at ¶¶ 15-17; Doc. 86 at 1 [¶¶ 15-17 not disputed]). Plaintiff also does not dispute that "an out-of-county warrant – such as the one at issue – should be verified with the originating county by the Rogers County Dispatch." (Doc. 72 at ¶ 23; Doc. 86 at 1 [¶ 23 not disputed]). When the dispatcher for the RCSO called the CCSO to verify the warrant, the CCSO immediately informed the dispatcher that the warrant was no longer active and that "there would be no hold from Cleveland County." (Doc. 72 at ¶ 27; Doc. 86 at 1 [¶ 27 not disputed]; Attachment 20 [conventionally filed CD]). That call took less than two minutes. (Attachment 20). Plaintiff was in custody at that time. (*See id.* [RCSO reported that they "ha[d] plaintiff in custody and ... want to know if you want to place a hold for her."]).

Under the uncontroverted evidence, plaintiff has not provided evidence of any Cleveland County policy or practice that directly caused, or was the moving force behind, any constitutional injury to plaintiff. It took a phone call of less than two minutes for Cleveland County to report that the warrant was no longer active. Plaintiff acknowledges that an out of county warrant should be verified with the issuing authority. When that was done here - albeit belatedly by the mistake of RCSO employees - the CCSO timely reported that the warrant was not active.

In addition, as to her claim against Sheriff Lester in his official capacity, plaintiff does not dispute that the CCSO does not send warrants to other counties. (Doc. 72 at ¶ 38; Doc. 86 at 1 [¶ 38 undisputed]). Thus, any failure of CCSO to send notice of a subsequent recall of a

warrant could not be the moving force behind any constitutional deprivation by the arrest of plaintiff on a copy of a warrant that had not been sent by CCSO to RCSO in the first place.

In the Introductory Statement to her Amended Complaint, plaintiff also alleges that Sheriff Lester and Court Clerk Hall "failed to properly instruct, supervise, control, train, and discipline [their] employees." (Doc. 47 at 2-3). However, plaintiff has not presented any evidence supporting that allegation, and she does not dispute that employees in the warrants division of the CCSO received verbal and non-verbal on-the-job training, and employees of the Cleveland County Clerk's Office also receive verbal and on-the-job training on handling small claims bench warrants. (Doc. 72 at ¶¶ 34-36; Doc. 86 at 1 [¶¶ 34-36 not disputed]).

Plaintiff has also not presented any evidence of deliberate indifference to the plaintiff's constitutional rights, as is required for a failure to train claim. *Canton*, 489 U.S. at 387-88. Notwithstanding her claim that there is a "question of fact" regarding deliberate indifference (Doc. 86 at 16), plaintiff has presented no evidence of deliberate indifference other than the bare fact that Cleveland County did not notify the RCSO that the warrant had been recalled. That failure alone does not prove deliberate indifference by any Cleveland County official or entity, and plaintiff has cited no apposite authorities that support her argument otherwise.

The Cleveland County defendants are entitled to summary judgment for lack of any showing of a policy that was the moving force behind any constitutional deprivation.

## V.     State Tort Claims

### A.      Emotional Distress Claims Against Jones, Potter, Oberg, and Weast

Plaintiff has conceded that her claims for intentional and negligent infliction of emotional distress should be dismissed entirely. (Doc. 68 at 13; *see also* Doc. 74). Those claims are accordingly dismissed.

## B.     Assault and Battery Claim Against Jones

Under the Oklahoma Governmental Tort Claims Act (OGTCA), individual defendants are not liable for torts committed within the scope of their employment.  The OGTCA precludes tort actions against "an employee of the state or political subdivision acting within the scope of his employment."  *Okla. Stat.* tit. 51, § 163(C); *see also id.*, §§ 152.1(A), (B), 153(A) (political subdivisions and their employees acting in scope of employment are immune from tort liability, except that the state waives the immunity as to the political subdivisions [not the employees]). "'Scope of employment' means performance by an employee acting in good faith within the duties of the employee's office or employment or of tasks lawfully assigned by a competent authority...."  *Okla. Stat.* tit. 51, § 152(12).  Thus, individual government employees are immunized from tort liability for actions taken while acting within the scope of employment. *See id.* § 163(C); *Speight v. Presley*, 203 P.3d 173, 179 (Okla. 2008); *Martin v. Johnson*, 975 P.2d 889, 895 (Okla. 1998); *Nelson v. Pollay*, 916 P.2d 1369, 1373 (Okla. 1996).

It is undisputed that Jones was acting within the scope of his employment at all times relevant to this suit.  (Doc. 74 at 13, ¶ 24; Doc. 87 at 6).  Accordingly, he is immune from tort liability for any torts he committed, and plaintiff's Fifth Cause of Action for assault and battery against Jones will be dismissed.  Plaintiff does not contest that her claim for assault and battery is against Jones, and she did not even respond to Jones's summary judgment argument that he is immune for all torts allegedly committed within the scope of his employment.

## C.     False Arrest Claim Against Jones, Potter, Oberg, and Weast

It is likewise undisputed that, at all material times, defendants Jones, Potter, Oberg, and Weast were acting within the scope of their employment.  (Doc. 74 at 13, ¶ 24; Doc. 87 at 6). They are immune from tort liability for any tort committed within the scope of their employment.

*See* discussion and authorities cited above regarding Jones's tort immunity for assault and battery under the OGTCA.

### D.        Any Tort Claims Against the Rogers County Board

To the extent that plaintiff has attempted to assert assault and battery and false arrest claims against the Rogers County Board (which is unclear from either her Amended Complaint or her summary judgment response), such claims should also be dismissed.  Plaintiff agrees that a claim for assault and battery will not lie against an officer making a lawful arrest so long as the force or threat of force is reasonable.  (*See* Doc. 87 at 17-18).  She does not dispute that the force used to arrest her was reasonable, but she argues that Deputy Jones did not have probable cause to arrest and therefore his actions may be found to constitute assault and battery.  (*Id.* at 18).  Because the Court has determined that Deputy Jones *did* have probable cause to arrest on the information he had at the time of the arrest, any assault and battery claim plaintiff seeks to assert against the Rogers County Board is subject to summary judgment.

Plaintiff's false arrest claim (to the extent asserted against the Rogers County Board) fails for the same reason. Under *Okla. Stat.* tit. 51, § 155(4), the County "shall not be liable if a loss or claim results from ... [a]doption or enforcement of ... a law, whether valid or invalid, including, but not limited to, any statute, charter provision, ordinance, resolution, rule, regulation or written policy."  The statute immunizes the state and its political subdivisions for claims of false arrest made with probable cause.  *See Overall v. State ex rel. Dep't of Public Safety*, 910 P.2d 1087, 1092 (Okla. Civ. App. 1995).  Because probable cause existed for plaintiff's arrest, Rogers County is immune and entitled to summary judgment.

**VI.     Conclusion**

For the foregoing reasons, the Rogers County Defendants' Motion for Summary Judgment (Doc. 74) and the Cleveland County Defendants' Motion for Summary Judgment (Doc. 71) are **granted**.  A separate Judgment will be entered forthwith.

Because the issues have been determined on summary judgment, all other pending motions (Doc. 58 and 70) are **moot**.

SO ORDERED this 4th day of August, 2014.

JOHN E. DOWDELL
UNITED STATES DISTRICT JUDGE